UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HILDA M.,[1]

        Plaintiff,

   v.

ANDREW M. SAUL,

        Defendant.

Case No. 19-cv-02505-TSH

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 13, 14

## I.    INTRODUCTION

Plaintiff Hilda M. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Andrew M. Saul, Commissioner of Social Security, denying her claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 13 (Pl.'s Mot.), 14 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REMANDS** for further proceedings consistent with this Order.

## II.    BACKGROUND

### A.    Age, Education and Work Experience

Plaintiff is 56 years old.  AR 160.  She has worked as a receptionist, data entry clerk and as an accounting clerk.  AR 62-63.

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

**B.     Medical Evidence**

**1.     Medical Records**

On April 22, 2015, Plaintiff saw Karen Khin Ouyang-Shwe, M.D., for leg pain and dizziness. AR 315. An x-ray of her left knee showed mild osteoarthritis. AR 349.

On May 5, 2015, Iype Abraham, M.D., saw Plaintiff for ongoing pain in her left leg and foot, aggravated by prolonged sitting or bending, and her symptoms were not improving with physical therapy. AR 309. On examination, Plaintiff was 225lbs, had marked lordosis, tenderness in her left knee, a positive straight leg raise test, and was using a cane to walk. AR 309-10. All other findings were normal. *Id.*

On May 13, 2015, Dr. Abraham prepared a Work Status Report in which he found Plaintiff could stand and walk only occasionally, lifting/carrying/pushing/pulling no more than ten pounds and working no more than four hours a day. AR 231. At a visit with him on that date, Plaintiff noted that her pain was aggravated by movement, with ongoing numbness and tingling, but that her medications provided some relief and helped with sleep. AR 307. She also noted feeling woozy and fatigued. *Id.* On examination, she had painful range of motion, a positive straight leg raise test on the left, and a limping gait. AR 308. All other findings were within normal limits. *Id.* Dr. Abraham opined that her fatigue could also be secondary to obesity. *Id.*

On June 9, 2015, James Nguyen, M.D., determined that Plaintiff was unable to perform prolonged sitting or lifting, would have episodic, week-long flare ups approximately five times a year, and would be unable to perform her work duties because of chronic pain. AR 232-35.

A C-Spine MRI from July 1, 2015 showed a moderate central and left disc spur or protrusion at C4-5, a small protrusion at C5-6, without cord compression or neural impingement. AR 249. A thoracic spine MRI from the same date showed a small central disc protrusion at T6-7. *Id.* A lumbar spine MRI from the same date showed a right lateral disc protrusion at the right L5 nerve root. AR 250.

At a July 13, 2015 visit, Dr. Nguyen opined that Plaintiff's pain was caused by myofascial pain syndrome. AR 295-96. Plaintiff stated that climbing stairs, prolonged sitting and lifting contributed to her pain. AR 295.

On September 8, 2015, Plaintiff saw psychologist Richard Beaver, Ph.D. AR 273-75. Plaintiff reported that her daily activities included helping her parents for four hours a day, performing housework and cooking but with a low sitting tolerance, and that her exercise was limited. AR 274. She also reported that her current psychosocial stressor was "trying to complete her daily duties due to limitations." *Id.* Dr. Beaver noted a "flat affect, lethargic, [and] dysphoric" mental status and diagnosed an adjustment disorder. *Id.*

Susan Casto, P.T., performed a physical therapy evaluation that same day and found Plaintiff able to make position changes only very slowly and that she had more difficulty initiating full strength with her left hand. AR 276. Plaintiff reported that her symptoms were activity dependent, disrupted her sleep and that she experienced a worsening of symptoms after physical therapy in June 2015. *Id.*

Plaintiff received acupuncture treatment in September 2015, reporting to the practitioner that her activities were severely impacted by pain, which was currently at a level 7/10. AR 271-72. At a September 8, 2015 visit with Joseph Robert Klein, M.D., she told him the acupuncture was helpful for fatigue, but not pain. AR 277-78.

On September 15, 2015, Plaintiff saw Mohammad Hassan Moussavian, M.D., for a neurology consult based on complaints of two years of "worsening left-sided body pain associated with numbness/tingling that varies in both arms and left leg, also with dizziness and difficulties with balance, blurred vision." AR 268. Dr. Moussavian found Plaintiff's neurologic examination was unremarkable and diagnosed myofascial pain syndrome. AR 270.

At a phone appointment on September 25, 2015, Plaintiff complained of severe sedation with Nortriptyline, as well as having personal difficulties because of her parents' medical needs. AR 266. She reported using a TENS unit that was "helpful." *Id.*

On November 23, 2015, Plaintiff reported to Dr. Klein that some of her medications were helpful, but she still had an 8/10 pain score for her lower back and was having poor sleep. AR 258. She also complained to a nurse of severe, significant interference with her daily activities. AR 261.

Plaintiff also participated in the Pain Management Program at Kaiser that included both

3

physical therapy and a 90-minute group cognitive-behavioral therapy session conducted by Psychologist Sarah Rabia Majid.  AR 241, 260, 264-65.  On January 13, 2016, Plaintiff reported to Dr. Majid that her pain was more controlled, the relief was "moderate," and she had increased awareness of factors that increase or decrease pain perception.  AR 252-53.  However, she also reported that she was "not able to cope with pain."  AR 253.  Dr. Majid noted Plaintiff had a depressed, anxious, stressed and frustrated mood with poor insight into her psychological condition and its effect on pain symptoms.  *Id.*

On February 2, 2016, Plaintiff saw Dr. Nguyen for her chronic left-sided pain, which she continued to have even though she found the pain management program "helpful."  AR 248.  Her physical examination showed no abnormalities.  AR 249.

On February 24, 2016, Plaintiff reported to Dr. Majid waxing and waning symptoms of anxiety and depression influenced by "biopsychosocial stressors."  AR 242-43.  On examination, Dr. Majid found her to have a depressed and anxious mood with poor insight, diagnosing Adjustment Disorder as well as Chronic Pain Syndrome.  AR 243.  Plaintiff declined a referral to the Adult Psych Department at Kaiser, but she scheduled a one-on-one appointment with Dr. Majid.  AR 244.  At the appointment on March 24, 2016, Plaintiff described her pain as a 7/10 but that she had improved her coping skills, awareness of pain factors, and mood.  AR 377.  Plaintiff also reported impaired memory and concentration.  AR 378.  Dr. Majid described her mood as "concerned, down and anxious" with congruent affect and slowed speech.  *Id.*

Plaintiff saw Dr. Klein again on March 23, 2016.  AR 370.  She reported that her pain was "well controlled" but continued to be present despite medications, was aggravated by massage, and was a 7/10.  *Id.*  Her functional level was "somewhat limited," her mood fair and her sleep poor.  *Id.*  Dr. Klein started her on an additional medication, Cymbalta.  AR 372.  By May 9, 2016, Plaintiff reported to Dr. Klein some improvement with Cymbalta but continuing drowsiness and difficulty sleeping.  AR 397.  She reported being able to increase her activities at home, and her pain score of 6-7/10 had improved from her previously typical 8/10 intensity.  *Id.*  Dr. Klein advised her to taper her Lyrica because of the drowsiness and low mood.  AR 399.

On May 17, 2016, Plaintiff saw Dr. Majid for mental health therapy and reported having

some improvement with pain levels at a 6/10. AR 408. She reported experiencing an improved mood with depressive symptoms but no anxiety. AR 409. Dr. Majid noted Plaintiff's insight had improved. *Id.*

On June 7, 2016, Plaintiff reported to Dr. Klein that her pain was well controlled at rest but aggravated by activity. AR 421. She was more alert than previously with the decreased dosage of Lyrica. *Id.*

On June 29, 2016, Plaintiff reported to Dr. Majid that she continued to have waxing and waning depressive and anxious symptoms. AR 430. Dr. Majid described her insight as "poor but improved." *Id.*

On July 5, 2016, Plaintiff reported to Dr. Abraham that she had increased pain and was using a cane for a flare up of her symptoms. AR 453. Her range of motion was restricted due to pain, but examination findings were otherwise within normal limits. AR 453-54.

On July 14, 2016, Plaintiff informed Dr. Klein that her pain was variable, her only side effect from her medications was difficulty getting out of bed, and that her medications were still helpful. AR 452.

On August 15, 2016, Dr. Majid noted a dysthymic mood and "impaired but improved" insight as well as a current pain intensity level of 7. AR 449.

On April 23, 2017, Dr. Nguyen completed a Physical Residual Functional Capacity Questionnaire. AR 474-77. He described Plaintiff's diagnoses as fibromyalgia, chronic pain syndrome, and cervical, thoracic and lumbar spondylosis. AR474. He described her treatment as consisting of physical therapy, acupuncture, trigger point injections, medication, and chronic pain programs. *Id.* Dr. Nguyen opined that Plaintiff's symptoms would be severe enough to constantly interfere with her attention and concentration. *Id.* He found her chronic pain would not allow her to tolerate even low-stress work. *Id.* Dr. Nguyen also provided the following opinions: she could only stand or sit for ten minutes before needing to change position; could not sit, stand or walk for more than two hours in an eight-hour workday; and she would need unscheduled breaks during the day approximately every hour. AR 475. He opined she would not need a cane, should not lift or carry more than ten pounds, only rarely stoop or crouch, had limitations on handling, reaching and

fingering more than twenty percent of a workday, and that her condition would cause good days and bad days and that she would be likely to miss more than four days of work in a month as a result of her impairments and treatment. AR 476.

On October 4, 2016, Plaintiff had a phone appointment with Dr. Majid regarding biopsychosocial factors impacting her pain. AR 540. Dr. Majid's therapy consisted of strategies for coping with pain management and improving emotional stability. *Id.* Her mental status exam was normal except for slurred, slow speech, frustrated mood (reported), and only marginal insight. AR 541.

Plaintiff saw Dr. Majid again on November 15, 2016, at which time she rated herself as having an improved awareness and ability to cope with her pain, which she rated at a 6-8/10 for the past two weeks. AR 530. Dr. Majid categorized coping ability as only slightly improved. *Id.* Dr. Majid's mental status exam found Plaintiff's mood to be anxious, irritable, and frustrated with perseverating thought processes and slowed speech. AR 531. All other findings were within normal limits, and Dr. Majid continued to find improved insight. *Id.*

On December 13, 2016, Plaintiff began seeing primary care doctor Ami Ashok Rughani, M.D. AR 516-17. At her initial appointment, she complained of feeling depressed, her pain medications making her "loopy," that she tried to exercise but was hampered by her muscle stiffness, and that she paces her chores. AR 517. Dr. Rughani advised her to exercise as tolerated to lose weight but to practice "non-weight bearing exercise" because of her osteoarthritis of the knee. AR 520. Dr. Rughani referred Plaintiff to an osteopathic doctor and for a sleep study. AR 520-21.

On December 27, 2016, Joshua Nguyen, D.O., diagnosed Plaintiff with non-allopathic lesions of the lumbar, cervical, thoracic regions as well as in her bilateral legs. AR 511. He performed osteopathic manipulative treatments on several occasions. AR 482, 488, 497.

On January 9, 2017, Plaintiff was diagnosed with severe sleep apnea. AR 502.

At a visit with Dr. Joshua Nguyen on January 25, 2017, Plaintiff described her pain level as 7/10, which was worsened with activity. AR 487. She obtained some relief from pacing her activities throughout the day but was frustrated with the lack of relief from her medications. *Id.*

6

At that appointment, Dr. Nguyen found her to have multiple areas of tissue tenderness, to have reduced strength in the left leg, and some reduced range of motion in her thoracic and cervical spine. AR 488. All other findings were within normal limits. *Id.*

Plaintiff saw Dr. Joshua Nguyen again on February 9, 2017, at which time she complained of pain at a 6/10 level that was worse with any prolonged sitting, such as visiting with her father at the hospital. AR 480. On February 27, 2017, Dr. Nguyen diagnosed fibromyalgia and performed lidocaine injections into three trigger points. AR 626-27.

In March 2017, Plaintiff emailed Dr. Joshua Nguyen to inform him that her pain was increasing. AR 614, 619. On March 1, 2017, Dr. Nguyen examined Plaintiff and found she had a positive straight leg raise test, tightness and spasm in her IT band. AR 620-21. On April 12, 2017, Dr. Nguyen found Plaintiff to have multiple areas of tissue texture tightness. AR 585. He also mentioned the possibility of fibromyalgia as the underlying disease. AR 586.

On April 24, 2017, Dr. James Nguyen evaluated Plaintiff at the spine clinic. AR 578. After performing a physical examination, reviewing her treatment history, and the results of her MRIs, Dr. Nguyen diagnosed Plaintiff with fibromyalgia. AR 583. The physical examination demonstrated multiple tender points in the areas of her: right paraspinal and trapezius; left medial and inferior scapula; midline, and bilateral paraspinal lumbar; and bilateral psis (posterior superior ileac spine)] of the lumbar region. AR 580-81. Dr. Nguyen performed trigger point injections. AR 583.

At a May 2, 2017 evaluation with Dr. Joshua Nguyen, Plaintiff complained of pain at a level of 8/10. AR 572. Dr. Nguyen advised Plaintiff that her pain may be the result of fibromyalgia. AR 574. Plaintiff received osteopathic manipulation therapy from Dr. Nguyen on June 15, 2017 and stated she was obtaining improvement with therapy, with a decrease in her pain level from a 6 or 7/10 to a 5/10. AR 551, 557. Plaintiff continued to receive osteopathic manipulation therapy from Dr. Nguyen through October 2017, with slight decreases in her pain level after therapy. AR 633, 638-39, 646-48, 669-72, 678-80, 685. Dr. Nguyen found multiple areas of tissue tenderness. AR 648. He saw her in December 2017 after her pain increased once again, at which time she reported greater difficulty walking. AR 696-98.

On August 24, 2017, Wayne Foster Smith, M.D., informed Plaintiff that the trigger point injections were unlikely to bring any lasting relief, that the therapy with Dr. Joshua Nguyen was only temporarily helpful, and that weight management was important. AR 668.

On September 1, 2017, Plaintiff was evaluated by Rheumatologist Farah Fatima Salahuddin, M.D. AR 657. Dr. Salahuddin reviewed her symptoms, prior treatment history, imagining, and referred her for a laboratory work-up to confirm a diagnosis of fibromyalgia. AR 657-60.

Plaintiff also continued to attend physical therapy. On May 25, 2017, her physical therapy goals included: tolerate sitting and/or driving for thirty minutes; walk half a mile; perform a functional squat; resume prior level of function with fifty percent less pain. AR 561. On June 8, 2017, the therapist noted that her gait was slightly antalgic due to a flare up of pain in her right leg. AR 553. By July 11, 2017, the only goal that had been met was an ability to walk half of one mile. AR 683. However, Plaintiff also noted that she was hurting more and not doing well after spending more time walking. AR 684.

On November 13, 2017, Dr. Rughani prescribed a four wheeled walker. AR 701. At that time, Plaintiff weighed 235lbs and was five feet and two inches. *Id.*

On December 14, 2017, Dr. Joshua Nguyen filled out a questionnaire regarding Plaintiff's functional limitations. AR 715. He opined that Plaintiff needed to take unscheduled breaks and would be absent on average more than four days per month due to debilitating pain. *Id.*

An x-ray of Plaintiff's knee on March 1, 2018 showed moderate degenerative changes and large joint effusion. AR 31.

### 2. Functioning Report

On March 14, 2016, Plaintiff submitted a function report detailing her difficulty standing, sitting, walking, concentrating, and sleeping because of her muscle pain. AR 184-92. Plaintiff stated she only cooked things that are simple, she has safety bars in her shower for balance, she can only do light cleaning and needs help with laundry, and she paces herself and sometimes needs to lie down when doing chores. AR 185-86. She also noted that she needs help loading and unloading groceries and can only drive if it is close by and not at night. AR 187. Plaintiff noted

8

that she gets along well with others but can only follow simple, not detailed instructions, and she gets frustrated when there are any changes to her routine because she has to pace herself. AR 189-90. Plaintiff also stated that she uses a cane prescribed to her in April 2015 when she leaves the house. AR 190. She stated that her medications caused her drowsiness, dizziness, fatigue, and difficulty concentrating. AR 191.

### 3. State Agency Reviewing Doctors

Sadda V. Reddy, M.D., reviewed Plaintiff's records and found she has severe impairments of a back disorder and osteoarthritis of the knee. AR 74-75. Dr. Reddy opined Plaintiff could perform light work with postural limitations. AR 74.

A. Garcia, M.D., reviewed Plaintiff's mental health records and found that her limitations from any affective disorder were only mild. AR 75.

The state agency reviewing doctors at the reconsideration level affirmed the initial reviewing doctors' opinions. AR 88-89.

### III. SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On March 7, 2016, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on April 22, 2015 due to Chronic Pain Syndrome, Osteoarthritis of Left Knee, Lumbar Radiculopathy, and Facial Pain Syndrome. AR 160-61. On April 28, 2016, the agency denied Plaintiff's claim, finding she did not qualify for disability benefits. AR 96-99. Plaintiff subsequently filed a request for reconsideration, which was denied on September 8, 2016. AR 102-09. On September 27, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 110-11. ALJ Robert Freedman conducted a hearing on January 18, 2018. AR 35-70. Plaintiff testified in person at the hearing and was represented by counsel, Cynthia Starkey. The ALJ also heard testimony from Vocational Expert Larry Haney.

### A. Plaintiff's Testimony

Plaintiff testified that her prior work consisted of spending three-fourths of the day sitting in front of a computer entering data. AR 42. She stopped working because her pain grew worse with sitting and she was having trouble walking up the stairs. AR 43. She could not do most of the exercises that have been recommended to her in physical therapy other than stretching, she

9

1  could not do extended walking, she had been treated with the chronic pain program and different

2  medications, and it was hard for her to sit through the hour and a half group therapy classes at

3  Kaiser.  AR 44-47.  Plaintiff testified that her muscle pain and fibromyalgia prevented her from

4  working and she had numbness and tingling in her hands and feet.  AR 48.  She stated she can do

5  some household chores but does not vacuum, made only one meal a day, and could only do the

6  dishes if she could "take the weight off" and there are not too many.  AR 50-51.  She could drive

7  for around 20 minutes depending on the pain but would need to break for at least ten minutes

8  afterwards.  AR 51-52. She needed help bringing in the groceries and could walk for maybe 15

9  minutes before needing a break of approximately 10 minutes.  AR 52.

10  Plaintiff attempted to go back to work for four hours a day with a sit/stand option (an

11  ergonomic desk) and no stairs to climb, but she was unable to do the work.  AR 54.  She testified

12  she went to Cabo for vacation in 2017 but came back in worse pain, used a cane and a wheelchair

13  at the airport, and she mostly spent time sightseeing and hanging around on the beach.  AR 55.

14  Plaintiff pays bills for about 10 minutes at a time every other month.  AR 56.  She also testified

15  that she used a walker or a cane.  AR 59-60.

16  **B.      Vocational Expert's Testimony**

17  The vocational expert testified that Plaintiff has past work under the Dictionary of

18  Occupational Titles ("DOT")[2] as a receptionist (DOT 237.367-038, Specific Vocational

19  Preparation ("SVP")[3] level 4), data entry clerk (DOT 203.582-054, SVP 4), and as an accounting

20  clerk (DOT 216.482-010, SVP 5).  AR 62-64.  The ALJ then asked the expert three hypotheticals.

21

22

23
[2] The Dictionary of Occupational Titles by the United States Department of Labor, Employment & Training Administration, may be relied upon "in evaluating whether the claimant is able to perform work in the national economy."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The DOT classifies jobs by their exertional and skill requirements and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d) (1).  The "best source for how a job is generally performed is usually the Dictionary of Occupational Titles."  *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).

[3] "The Dictionary of Occupational Titles lists an SVP time for each described occupation.  Using the skill level definitions in 20 C.F.R §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Social Security Ruling 00-4p.

1    For the first, the ALJ asked the expert to

2        assume a hypothetical individual the same age, education level, and
     professional experience as the claimant, and please assume that this
3        hypothetical has the following limitations.  The exertional level of
     light but with the following additional limitations, that the duration of
4        time spent standing over the course of a day would be limited to no
     more than four hours; the use of ramps and stairs would be limited to
5        no more than occasional; ladders, ropes, and scaffolds would be
     limited to never.  Please further assume that balancing is - - balancing,
6        stooping, crouching, crawling, and kneeling are all limited to no more
     than occasional.  So, given all these limitations, could such a
7        hypothetical individual perform any of the past work of the
     claimant?"

8

9    AR 64.  The expert responded that the individual could perform all three positions.  *Id.*

10   For the second, the ALJ asked the expert to

11       assume hypothetical individual of the same age, education level, and
     professional experience as the claimant, please assume that this
12       hypothetical individual is subject to the same limitations I stated in
     hypothetical number one but subject to the following additional
13       limitations, that the exertional level is reduced down to sedentary.  So,
     at sedentary with those additional limitations, could such a
14       hypothetical individual still perform the past work of the claimant?

15   AR 64-65.  The expert responded that the individual could still perform all three positions.  AR

16   65.

17   For the third, the ALJ asked the expert to

18       Assume the same limitations as hypothetical number two, but please
     assume the following additional limitations, that the - - that such a
19       hypothetical individual would required at least two additional breaks
     over the course of a day of 15 minutes duration each, and that this
20       hypothetical individual would require the ability to change positions
     from a seated position to a standing position or vice versa at least
21       twice per hour.  With these additional limitations, could such a
     hypothetical individual perform the claimant's past work?

22

23   AR 65.  The expert responded that the individual could not because the additional breaks would be

24   beyond what the typical employer would tolerate and having to stand twice a day "basically puts

25   that into a sit/stand option type of a position and I don't think that particular sit/stand option of

26   twice per hour for any one of those three types of jobs would be tolerable with the employer."  AR

27   65-66.

28   The ALJ then asked a follow-up question for the second hypothetical: "if such a

11

1    hypothetical individual would be required to miss four days per month would that be work

2    preclusive as well?" AR 66. The expert responded that it would as it is four times the national

3    average as determined by the Department of Labor. *Id.*

4          On questioning from Plaintiff's attorney, the expert testified that if an individual were

5    restricted from using their hands or arms more than 20 percent of the day, they could not perform

6    Plaintiff's past work. AR 66-68.

7    **C.    ALJ's Decision and Plaintiff's Appeal**

8          On June 28, 2018, the ALJ issued an unfavorable decision finding Plaintiff was not

9    disabled. AR 12-24. This decision became final when the Appeals Council declined to review it

10    on March 18, 2019. AR 1-3. Having exhausted all administrative remedies, Plaintiff commenced

11    this action for judicial review pursuant to 42 U.S.C. § 405(g). On November 21, 2019, Plaintiff

12    filed the present Motion for Summary Judgment. On December 18, 2019, Defendant filed a

13    Cross-Motion for Summary Judgment.

14               **IV.   STANDARD OF REVIEW**

15          This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

16    U.S.C. § 405(g). An ALJ's decision to deny benefits must be set aside only when it is "based on

17    legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d

18    664, 674 (9th Cir. 2017) (citation and quotation marks omitted). Substantial evidence is "such

19    relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*

20    *v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted). It requires

21    "more than a mere scintilla" but "less than a preponderance" of the evidence. *Id.*; *Trevizo*, 871

22    F.3d at 674.

23          The court "must consider the entire record as a whole, weighing both the evidence that

24    supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm

25    simply by isolating a specific quantum of supporting evidence." *Trevizo*, 871 F.3d at 675 (citation

26    and quotation marks omitted). However, "[w]here evidence is susceptible to more than one

27    rational interpretation, the ALJ's decision should be upheld." *Id.* (citation and quotation marks

28    omitted). "The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation and quotation marks omitted).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (citation and quotation marks omitted). A court may not reverse an ALJ's decision because of a harmless error. *Id.* at 1111 (citation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* (citation and quotation marks omitted).

## V. DISCUSSION

### A. Framework for Determining Whether a Claimant Is Disabled

A claimant is considered "disabled" under the Social Security Act if two requirements are met. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that the claimant is unable to perform previous work and cannot, based on age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[4] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential

---

[4] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined Plaintiff had not performed substantial gainful activity since April 22, 2015. AR 17.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined Plaintiff had the following severe impairments: degenerative disk disease cervical spine, disc protrusion lumbar spine, mild osteoarthritis left knee, and chronic pain. AR 17.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 19.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e).

In the RFC assessment, the ALJ assesses the claimant's physical and mental abilities, as well as other abilities affected by the claimant's impairments. *Id.* §§ 404.1545(b)-(d), 416.945(b)-(d). With respect to a claimant's physical abilities, "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id.* §§ 404.1545(b), 416.945(b). With respect to a claimant's mental abilities, "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work." *Id.* §§ 404.1545(c), 416.945(c). Additionally, "[s]ome medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities." *Id.* §§ 404.1545(d), 416.945(d).

Here, the ALJ determined Plaintiff has the RFC to perform a full range of sedentary work.[5] AR 19.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined Plaintiff could perform past relevant work as an accounting clerk, receptionist, and data entry clerk. AR 23.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines. at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).[6] Here, the ALJ did not reach the fifth step as he determined Plaintiff could perform her past relevant work.

## B.      Plaintiff's Arguments

Plaintiff raises four issues: (1) whether the ALJ properly found at step two of the sequential evaluation process that her mental health impairments were not severe; (2) whether the ALJ properly found at step two of the sequential evaluation process that her fibromyalgia was not a severe impairment; (3) whether the ALJ provided legally sufficient reasons for discounting Plaintiff's testimony; and (4) whether the ALJ properly addressed medical source statements.

## C.      Step Two Analysis

Step two of the Commissioner's sequential evaluation process requires the ALJ to determine the severity of the claimant's medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). It serves as a "de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ is to determine whether the claimant has a "medically severe impairment or combination of impairments." *Id.* A severe impairment is that "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The claimant has the burden at step two to show that he has a severe impairment. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

### 1.      Mental Impairments

In addressing Plaintiff's depression, the ALJ noted that:

> The claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is

---

[6] The Medical-Vocational Guidelines are commonly known as "the grids." *Lounsburry*, 468 F.3d at 1114.

therefore nonsevere. Treatment notes in February 2016 show the claimant complained of depression and anxiety caused by biopsychological stressors (Exhibit 3F, p. 5). In a mental status examination, the claimant appeared to be concerned, down, and anxious with impaired memory and concentration (Exhibit SF, p. 20). In a subsequent treatment note, the claimant's treating doctor noted the claimant was within normal limits with improved insight into psychological factors (Exhibit 6F, p. 6). No aggressive treatment was recommended or anticipated for this condition. Accordingly, the undersigned finds the claimant's medically determinable impairment of depression is nonsevere.

AR 18.

Plaintiff argues the ALJ's step two finding was highly prejudicial because he "did not include any potential psychiatric limitations such as the limitation to unskilled or low stress work into the Residual Functional Capacity (RFC) evaluation." Pl.'s Mot. at 10. She notes the record reflects that Dr. Majid found her mental status exam was within normal limits, "except for mood," and her insight was "impaired" but improved, *id.* at 9 (citing AR 449), and that her own function report advised that she had a "hard time concentrating" and was not sure how long she could pay attention and did not finish what she started, *id.* at 9-10 (citing AR 184-90). She argues: "When reviewed in its entirety, this report did not contain substantial evidence to support the ALJ's Step Two findings regarding [her] medically determinable impairment of depression." *Id.* at 10. Plaintiff further argues that even without a finding of severity at step two, it was legal error for the ALJ not to include even the mild limitations that he found as part of the RFC analysis at step 4. Had such limitations been included, "they would have ruled out all of [her] past relevant skilled and semi-skilled work, and the ALJ would have been required to proceed to step five of the sequential process." *Id.*

The Court finds the ALJ did not err in finding Plaintiff's mental impairments were not severe. As a preliminary matter, the only impairment Plaintiff refers to in her motion is depression, yet medical records frequently indicated "negative" for depression and she herself frequently indicated that any depression she experienced improved with treatment, or she reported no symptoms of depression at all. AR 315, 448-49 458-59, 462-63, 518. No physician or medical examiner identified any functional limitations resulting from depression. *See Champagne v. Colvin*, 582 F. App'x 696, 697 (9th Cir. 2014) (rejecting claimant's assertion that the ALJ

17

disregarded his treating physicians' opinions about his limitations "because none of the treating providers gave an opinion regarding his functional limitations" and claimant "identified no additional medically necessary limitation that should have been included in the residual functional capacity") (citing *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009)). Further, the State review physicians found the medical evidence indicated any affective disorders to be "non-severe," having at most only a mild effect on daily living activities, social functioning, concentration, persistence or pace. AR 75, 89.

Regardless, even if the Court were to find the ALJ committed any error at step two by finding none of Plaintiff's alleged mental impairments were severe, "[o]missions at step two are often harmless error if step two is decided in plaintiff's favor." *Martinez v. Berryhill*, 2017 WL 5900191, at *14 (N.D. Cal. Nov. 30, 2017) (citing *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005)); *Garcia v. Comm'r of Soc. Sec.*, 587 Fed. App'x 367, 370 (9th Cir. 2014) (any error in not identifying depression as severe at step two was harmless because "the ALJ proceeded through the entire sequential analysis, carefully considering all of [the] mental health records in assessing her [RFC]") (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence of limitations posed by claimant's bursitis at step four, any error in failing to consider bursitis severe at step two was harmless)); *Raymond G. v. Comm'r of Soc. Sec.*, 2019 WL 1332399, at *19 (N.D. Cal. Mar. 25, 2019) (where ALJ found PTSD was not severe at step two, any error in that determination was harmless because ALJ proceeded through the entire sequential analysis). If the ALJ finds that a claimant has a severe impairment or combination of impairments, the analysis continues, and any error in not specifically identifying an additional impairment is of no consequence, as the ALJ must consider the combined effect of all impairments, both severe and otherwise, in assessing RFC. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (discussing the step two evaluation), 404.1523 (addressing multiple impairments).

Here, the ALJ found Plaintiff had severe impairments and proceeded to step three. In his assessment of Plaintiff's RFC, the ALJ included the non-severe impairments discussed in her mental health records and found Plaintiff's mental impairment causes no more than "mild" limitation. AR 17-19. The ALJ considered Plaintiff's mental health treatment notes, which

showed she complained of depression and anxiety caused by biopsychological stressors, AR 18 (citing AR 243); that during a mental status examination with Dr. Majid she appeared to be concerned, down and anxious with impaired memory and concentration, *id.* (citing AR 378); that she stated she had difficulty with concentration and could only follow simple written and spoken instructions, *id.* (citing AR 184, 189); and that she stated she must pace herself when handling stress and gets frustrated with changes in routine, *id.* (citing AR 190). However, he also noted Plaintiff's treating doctor found she was within normal limits with improved insight into psychological factors, and no aggressive treatment was recommended for her condition, *id.* (citing AR 449); that Plaintiff stated she does not need reminders to take care of her personal needs or to take medication, *id.* (citing AR 186-87), and that she could handle activities and leave her home without assistance, including attending classes, *id.* (citing AR 187-88). Given this record, "[e]ven if Plaintiff were able to show that these impairments were severe, absent a showing that they result in limitations not accounted for in the RFC, any error in not identifying the impairments as severe is of no consequence." *Tyrone L. v. Saul*, 2019 WL 4417632, at *12 (N.D. Cal. Sept. 16, 2019).

As the ALJ found Plaintiff had at least one severe impairment and moved on to complete the sequential analysis with consideration given to all her severe and non-severe impairments, "any error in failing to name additional impairments as severe is harmless." *King v. Berryhill*, 2018 WL 4586726, at *11 (N.D. Cal. Sept. 25, 2018) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1042-43 (9th Cir. 2008)); *Tyrone L.*, 2019 WL 4417632, at *11. Accordingly, the Court finds the ALJ did not commit reversible error as to Plaintiff's mental impairments and the decision must be affirmed.

### 2. Fibromyalgia

In addressing Plaintiff's fibromyalgia, the ALJ stated:

> The undersigned has considered the claimant's alleged symptoms of fibromyalgia. A review of the claimant's medical record includes a diagnosis of fibromyalgia (Exhibit 10F, pp. 38). There is no objective medical evidence that documents this diagnosis resulted from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical or laboratory diagnostic techniques. A medically determinable impai1ment may not be established solely based on symptoms alone, or on the

> claimant's allegations regarding symptomatology (20 CFR
> 404.1508). There must be evidence from an acceptable medical
> source in order to establish the existence of a medically determinable
> impairment (20 CFR 404.1527(f)). There were no medical signs or
> laboratory findings to substantiate the existence of a medically
> determinable impairment through the date last insured. Accordingly,
> the undersigned finds there was a lack of objective evidence to
> substantiate the existence of a medically determinable impairment.

AR 19.

Plaintiff argues her fibromyalgia met the requirements for a finding that it was a severe, medically determinable impairment. Pl.'s Mot. at 12. She notes her testimony in which she stated fibromyalgia was primarily responsible for preventing her from being able to sustain work. *Id.* (citing AR 48). She also notes that her treating spinal specialist, Dr. James Nguyen, opined that fibromyalgia would prevent her from engaging in substantial gainful activity, and that her treating osteopathic doctor, Dr. Joshua Nguyen, also diagnosed fibromyalgia. *Id.* (citing AR 474, 574). Dr. Joshua Nguyen had also performed numerous physical evaluations and had reviewed her test results. (AR 480, 488-89, 574, 585-86, 648).

"Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) (quotation marks and citation omitted). Symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with [the] disease." *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). Individuals suffering from fibromyalgia have normal "muscle strength, sensory functions, and reflexes." *Revels*, 874 F.3d at 656. Further, "there are no laboratory tests to confirm the diagnosis." *Benecke*, 379 F.3d at 590. Fibromyalgia is thus "diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Id.*

"The Agency and the courts have determined that fibromyalgia is a real disorder that can impact a person's ability to work." *Slaff v. Colvin*, 2015 WL 404226, at *2 (C.D. Cal. Jan. 28, 2015) (citing *Benecke*, 379 F.3d 587 (9th Cir. 2004)); Social Security Ruling 12-2, Evaluation of Fibromyalgia, 2012 WL 3104869, *2 ("[Fibromyalgia is a [medically determinable impairment] when it is established by appropriate medical evidence. [Fibromyalgia] can be the basis for a finding of disability."). SSR 12-2p "provides guidance on how we develop evidence to establish

that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act (Act)." 2012 WL 3104869, at *1. A claimant must provide evidence that a licensed physician reviewed her medical history, conducted a physical examination, and made a fibromyalgia diagnosis. *Id.* at *2. The physician must also provide evidence which satisfies one of two alternate diagnostic criteria: the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia ("1990 Criteria"), or the 2010 American College of Rheumatology Preliminary Diagnostic Criteria ("2010 Criteria"). *Id.* at *2-3. Under the 1990 Criteria, the evidence must show: (1) "a history of widespread pain . . . that has persisted . . . for at least 3 months;" (2) at least 11 positive tender points, found both bilaterally and above and below the waist; and (3) evidence that other disorders which could cause the symptoms were excluded. *Id.* at *3. Under the 2010 Criteria, the evidence must show: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (3) evidence that other disorders which could cause the symptoms were excluded. *Id.* Finally, the physician's diagnosis must not be "inconsistent with the other evidence in the person's case record." *Id.* at *2.

Here, there is no indication the ALJ conducted the SSR 12-2p inquiry. As to the first criteria, the record reflects that Dr. James Nguyen and Dr. Joshua Nguyen diagnosed fibromyalgia after conducting physical examinations. AR 474, 626. As to the second, the ALJ conclusively states "there was a lack of objective evidence to substantiate the existence of a medically determinable impairment." AR 19. However, Plaintiff argues her treatment records and statements "showed evidence of at least six additional co-occurring symptoms, signs or conditions such as fatigue (AR 276, 278, 258, 307, 370, 378, 397, 474), cognitive or memory problems (AR 378, 474), waking unrefreshed (AR 452), depression (AR 253, 243, 517), anxiety (AR 378, 430, 531), dizziness (AR 191, 315, 268), blurred vision (AR 268), and numbness (AR 307)." Pl.'s Mot. at 12. Therefore, because there is no indication the ALJ conducted the SSR 12-2p inquiry, it is not clear that his decision is supported by substantial evidence of record.

Further, because the ALJ failed to adequately address whether fibromyalgia was a

medically determinable impairment at step two, his analysis at subsequent steps of the sequential evaluation might also be affected. Thus, it is not clear if the ALJ's error was harmless because it was not "inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (quotation marks and citation omitted); *see also McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (noting that remand is appropriate "where the circumstances of the case show a substantial likelihood of prejudice" to the party claiming error); *Binsacca v. Berryhill*, 2019 WL 3082841, at *7 (N.D. Cal. July 15, 2019) (finding reversible error in failing to find fibromyalgia to be a medically determinable impairment). The Court therefore finds there are outstanding issues that must be resolved before a final disability determination can be made because the step-two inquiry constitutes a "de minimis screening device to dispose of groundless claims," *see Edlund v. Massanari*, 253 F.3d 1152, at 1158 (9th Cir. 2001), and the ALJ's failure to properly consider Plaintiff's diagnosed fibromyalgia at step two could have affected the subsequent analysis at steps three through five. The Court therefore cannot conclude on the record before it whether the ALJ would be required to find Plaintiff disabled. *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) ("Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated.")

Accordingly, on remand the ALJ must: (1) consider Plaintiff's diagnosed fibromyalgia a medically determinable impairment at step two; (2) assess whether Plaintiff's fibromyalgia is a "severe" impairment; and (3) appropriately analyze the impairments and limitations caused by Plaintiff's fibromyalgia—regardless of severity—at subsequent steps of the sequential evaluation.

**D.      Plaintiff's Remaining Arguments**

Because remand is appropriate, the Court does not consider Plaintiff's remaining arguments, but the Agency should take them into account as part of its reconsideration.

## VI.      CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross motion, and **REMANDS** for further proceedings consistent with this Order.

*See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

**IT IS SO ORDERED.**

Dated: March 23, 2020

THOMAS S. HIXSON
United States Magistrate Judge